**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| STIMWAVE TECHNOLOGIES INCORPORATED, *et al.*,[1] | Case No. 22-_____ (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF AURE BRUNEAU IN SUPPORT OF THE DEBTORS'**
**CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF**

I, Aure Bruneau, hereby declare under penalty of perjury, pursuant to section 1746 of title

28 of the United States Code, as follows:

1.      I am the Chief Executive Officer of Stimwave Technologies Incorporated

("Stimwave") and Manager of Stimwave LLC, the above-captioned debtors and debtors in

possession (each, a "Debtor" and together, the "Debtors" or the "Company").  Stimwave is the

corporate parent of Stimwave LLC.  I have served as Stimwave's Chief Executive Officer since

April 2020, and I was appointed Manager of Stimwave LLC in October 2020.  In these capacities,

I am familiar with the Debtors' business, financial affairs, and day-to-day operations.

2.      I chose to join the Company because of my faith and belief in the fact that the

Company's innovation would help treat more chronic pain patients that otherwise would have

limited or no option for their debilitating conditions and my desire to ensure that this treatment

would remain available to continue to provide relief to patients suffering from debilitating chronic

pain.  I understood that numerous business challenges would also have to be addressed and

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Stimwave Technologies Incorporated (7426) and Stimwave LLC (5018).  The Debtors' headquarters are located at 1310 Park Central Blvd. S, Pompano Beach, Florida 33064.

resolved by the new management team.  Prior to joining the team, I spent twenty-four years of my career with various leading global medical device companies in various leadership roles.  More specifically, I have specialized in building and leading companies that have successfully developed and established numerous innovative products as new standards of care.  During the last two years, our team has built robust operations, solved countless legal and regulatory problems, optimized our cost structure and gained the trust and support of hundreds of physicians and thousands of patients across multiple countries. As a result, the Company has achieved its first goal of building a robust foundation that supports a unique therapy option for chronic pain patients.  Today, the Company commences these bankruptcy cases to support a sale process, obtain needed liquidity, and position the Company to carry out its next phase of growth by providing broad access of its unique therapy to thousands of patients in the future.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court").

4.      I submit this declaration (this "First Day Declaration"), pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to provide an overview of the Debtors' business and these chapter 11 cases (the "Chapter 11 Cases") and to support the Debtors' applications and motions for "first day" relief (collectively, the "First Day Motions").

5.      Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management, employees working under my supervision, the Executive Subcommittee

of Stimwave, and the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am authorized to submit this First Day Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6.       The Company is a rapidly growing medical device manufacturer and provider of permanently implanted neurostimulation products that offer a treatment alternative to opioids for chronic pain patients. The Company has developed and continues to manufacture a unique, minimally invasive technology platform that does not require the surgical implantation of a battery inside the patient, unlike many competitive products. The procedures are also more commonly performed in outpatient surgery centers (ASC). The Company's innovative products and services are utilized in spinal cord stimulation (SCS) for patients that cannot receive or do not want an implanted battery that is required for some competitor products. The Company's products are also predominantly utilized for peripheral nerve stimulation (PNS) in areas of the body such as shoulders, knees and foot & ankle. The Company also provides ongoing long-term service and support to over 7,300 patients that have been implanted with the devices to date. The Company is a market-defining leader in PNS, now a newer, rapidly growing field that has been made possible by the Company's unique technology advancements, as more traditional neurostimulation products with batteries cannot be surgically implanted in those areas of the body.

7.       As described in further detail below, for more than two years since I joined the Company, the team members and executives of the Company have worked tirelessly and successfully to materially improve all areas of our business. This includes but is not limited to building a market-leading, experienced team which has implemented and fostered a culture of quality and integrity in everything we do throughout our operations, including with respect to our

products, services, and support of our customers and their patients.    During this time of stabilization and growth, we have remedied and overcome historic financial and operational prior mismanagement at tremendous expense.    Nevertheless, all these accomplishments have resulted in growth as well as significant operational and financial positive performances. This work and new foundation position the Company, following the consummation of the Chapter 11 Cases, to carry out its mission to deliver our products and services that provide extraordinary relief from chronic pain.

8.    By initiating these Chapter 11 Cases, obtaining $40 million in DIP financing from their existing lender, and pursuing a section 363 sale process with their lender as stalking horse bidder (subject to higher or better bids), the Debtors intend to maximize the value of their assets, create liquidity for operations, and efficiently position themselves for long-term growth, all while providing seamless service to the physicians that utilize Stimwave  products and their patients that have found freedom from chronic pain.

9.    This First Day Declaration is organized as follows:

- **Part I -** Introduction and Overview of the Company;

- **Part II** - The Debtors' Business and Operations;

- **Part III -** Prior Management's Misrepresentations and Mismanagement;

- **Part IV -** Background to the Chapter 11 Cases;

- **Part V** - Organizational and Capital Structure;

- **Part VI** - Events Leading to the Chapter 11 Cases; and

- **Part VII** sets forth my basis for testifying to the facts underlying and described in each of the First Day Motions.

I.      **Introduction and Overview of the Company**

10.     The Company manufactures, distributes, and provides ongoing support for implantable, minimally invasive neurostimulators, which are used as a treatment for chronic intractable pain.   Stimwave's revolutionary technology is an innovative, highly effective, non-opioid treatment currently in use throughout the world by over 7,300 patients who have received permanent implants of Stimwave devices.   The Company is currently cleared by appropriate governing bodies to operate outside the United States in over 35 countries and intends to continue expanding into other markets in the future. Most of the Company's business activities outside the United States are conducted through its wholly owned subsidiary, Freedom Neuro BV.

11.     Since my appointment as CEO in April 2020, Stimwave has established a new strategic direction to optimize value creation.   The Company is well positioned to be accretive within the SCS market and to continue leading the rapidly growing PNS market.  The SCS market is large and well established with numerous implanted battery-based products from various companies.  The Stimwave products provide an additional SCS option for physicians that treat patients that cannot or do not want to receive an implanted battery. Additionally, it is estimated that most chronic pain patients suffer from pain that originates from areas other than the spine or back. These chronic pain conditions can be addressed with PNS.  Existing battery-based products cannot be implanted in shoulders, knees, foot & ankle and other parts of the body due to their physical size.  Stimwave's products do not require an implanted battery and can be implanted throughout the body for PNS applications below the head.  Today, more than 80% of Stimwave's growth comes from its unique PNS therapy applications.  Most importantly, Stimwave's physician customers and their patients now have a trusted option for opioid-free treatment of chronic pain.

12.     The Company is working to launch new products and services, while continuing to carry out a series of clinical trials to further establish PNS as a new standard of care. This will

further support our mission to establish our products as new standard of care while delivering sustainable growth.  During the last two years, Stimwave has conducted major initiatives focused on manufacturing operations, sales channels, product development, and go-to-market strategy, resulting in a transformation of the Company's operations and customer relationships.  The Company's redefined sales strategy focuses on accretive penetration of the existing SCS market, while maintaining its leadership position in the growing peripheral nerve stimulation market.  The Company currently employs approximately 134 employees and has contracts with approximately 18 independent sales agents.

## II.    The Debtors' Business and Operations

13.    The Company was founded in 2010.  Its products present a non-opioid alternative to costly major surgery, which is particularly crucial in an era during which the chronic pain patient population is expected to increase, both globally and domestically, due to aging populations and the growing incidence of musculoskeletal and other associated conditions.

14.    The Company manufactures and distributes two FDA-cleared devices: the Freedom SCS System ("Freedom SCS") and Freedom PNS System ("Freedom PNS").  Both the Freedom SCS and Freedom PNS devices use electrical stimulation to block pain signals from reaching the brain and are powered wirelessly, without an implanted battery.  More specifically, the Freedom SCS system is used for stimulation of nerves within the spinal column and targets pain in the trunk and/or lower limbs.  The Freedom PNS system is used for peripheral nerve stimulation, targeting pain of peripheral nerve origin below the neck.  The therapy utilizes pulsed electrical current to create an energy field that acts on certain nerves to alter transmission of pain signals to the brain.  Both the Freedom SCS and Freedom PNS systems consist of:

- An implantable electrode array (or "Lead")

- A separate receiver component, which is connected with the Lead during the surgical implant procedure; and

- An externally worn antenna and transmitter to power the device (collectively the "Wearable Antenna Assembly").

15.    With limited exceptions, the Freedom SCS and Freedom PNS systems are implanted following a successful temporary implant of the device during a trial period between two and four weeks.  After permanent implantation, the Freedom SCS and Freedom PNS systems require ongoing patient support and servicing from the Debtors, such as reprogramming and replacement of the external power source.  The Debtors also periodically evaluate and update their software to improve the patient experience and increase the stability of connectivity to the Wearable Antenna Assembly.  Commercialization of the Freedom SCS and Freedom PNS systems began in 2018, and, currently, over 7,300 patients have permanent Freedom SCS or Freedom PNS implants.

16.    The Debtors have regulatory clearance permitting operations in all 50 of the United States and over 35 countries outside the United States.  Products are delivered by Stimwave's clinical specialists or sales representatives on the order of a physician. A Company representative attends the implant procedure to answer physician and patient questions and program the device following the implant procedure.

17.    Stimwave manufacturers all products that it sells and holds the regulatory clearances for such products in the appropriate markets.  Stimwave LLC employs all employees in the United States (except for Lori Sullivan (Chief Legal Officer), Scott Sidwell (Chief Technology Officer) and me, who are each employed by Stimwave).  Stimwave LLC serves as the operating entity in the United States responsible for, among other things, research and development, quality control, operations, clinical trials, finance and accounting, sales and marketing.

18.    In December 2019, the Company entered into a lease agreement for its headquarters:  approximately 26,000 square feet of office and warehouse space located at 1310 Park Central Blvd. S, Pompano Beach, Florida, for a 5-year lease term beginning on February 10, 2020, and ending in January 2025.  The Debtors also pay a pro-rated share of operating expenses and real estate taxes.

19.    The Company's customers, medical facility and physicians users, bill payors (*e.g.*, Medicare and insurers) for the device and implant procedure.

### III.    Prior Management's Misrepresentations and Mismanagement

20.    My appointment as CEO came after Stimwave discovered financial irregularities and regulatory misrepresentations and mismanagement by certain executives (who are no longer employed by the Company), which involved, among other things, potential violations of certain federal health care laws and regulations.  Importantly, the misrepresentations were not related to the validity, safety or efficacy of Stimwave's products and technology.  Along with other newly hired executives, I was brought in to manage the Company through the risks associated with the actions of former management, implement pristine regulatory and legal compliance, retain new senior management, right-size operations, and put the Company in a position to grow and maximize value.  The senior management team has accomplished these goals.  Even in the face of the recent challenges described herein, the Company has leveraged its innovative technology and related intellectual property, generating revenue of approximately $50 million (representing material year over year growth) through a network of over 700 physician users.

21.    Unfortunately, the prior mismanagement of the Company described above materially hampered Stimwave's operations and future prospects and ultimately led to the commencement of these Chapter 11 Cases.  For example, as described further below, in October 2019, just prior to the departure of Stimwave's former CEO in November 2019, the Debtors

29459249.1

received a civil investigative demand from the U.S. Department of Justice (the "DOJ") pursuant to the False Claims Act and in the following months learned that DOJ had opened a parallel criminal investigation.  Since then, all members of prior senior management that the Debtors believe were involved in the conduct under investigation have resigned or have been terminated from their positions with the Company, and new management has been guiding the Company through the aftermath, fully cooperating with the DOJ in its investigation of both civil and criminal matters.

22.    Following discovery of the financial and operational mismanagement described above, the Company undertook its own independent extensive internal investigation and disclosed the facts of that investigation to the DOJ and FDA through multiple presentations since the beginning of 2020.  Further, the Company's remediation efforts began with bringing in new management, including deeply experienced professionals in the healthcare industry who have been and remain intently focused on remediation and compliance.  For example, the Company engaged a Chief Compliance Officer in April 2020 to implement an effective Compliance Program, and has retained a new Chief Compliance Officer in June 2021 with more than 25 years of requisite industry experience to test and provide ongoing oversight of the compliance program.  The Company has now built an effective Company-wide compliance program, created a true culture of compliance, and also focused on remediating the misconduct—including, among many other things, a voluntary recall that the Company coordinated with FDA.  The DOJ has previously acknowledged that the Company's cooperation and remediation have been extraordinary.

23.    The Company, as currently situated, is a wholly different company than existed under prior management—new management has effected a radical transformation of the Company's culture and operations in terms of compliance and transparency.

## IV.   Background to the Chapter 11 Cases

24.   In addition to the foregoing issues, the Company's complicated capital structure and stockholder and board voting rights have inhibited the Company from obtaining additional financing.  The Company's stockholders previously approved a cap of only $30 million in total indebtedness from Kennedy Lewis Capital Partners Master Fund LP ("KLCPMF") and Kennedy Lewis Investment Management, LLC ("KLIM" and together with KLCPMF, "Kennedy Lewis").[2] Any additional pre-petition debt would require various stockholder and board approvals that the Company believed would be difficult, if not impossible, to obtain.  Immediately pre-petition, the Company exhausted the remaining availability under the Term Loan Agreement with Kennedy Lewis (as described below).  Consequently, the Company had to commence these cases in order to access needed liquidity to maintain operations and implement a value maximizing sale transaction.

25.   In addition, the Company's operations and revenues have been buffeted by headwinds brought about by the COVID-19 pandemic, substantial litigation expenses including with its former founder and other parties that were unpaid by prior management, and the additional regulatory oversight and remedial action required following actions of former management in the highly regulated industry in which the Debtors operate.

26.   In light of the foregoing challenges, and because the Company is a growing business in a nascent space and requires near-term capital to fund working capital needs, legal costs, and other professional fees, these Chapter 11 Cases provide the best opportunity for the Debtors to maximize the value of their assets for the benefit of their stakeholders.  In the months

---

[2]   The Company also borrowed an additional $500,000 from Kennedy Lewis for which no stockholder approval was required.

leading to the Petition Date, the Company retained advisors to assess the Company's near- and long-term liquidity and operational needs.  The Company began initiating discussions in earnest with Kennedy Lewis and evaluating potential strategic alternatives to maximize stakeholder value, including by entering into a series of amendments and forbearances to the Debtors' Term Loan Agreement with Kennedy Lewis.  The Company and its advisors have explored financial and restructuring solutions, including potential capital raises, refinancing the Debtors' existing prepetition debt, in-court and out-of-court restructuring solutions, and other capital structure, financing, and strategic alternatives.

27.     These negotiations culminated in the Debtors finalizing and entering into a stalking horse asset purchase agreement with an affiliate of Kennedy Lewis (the "Stalking Horse APA"). The Stalking Horse APA will be subject to higher and better offers solicited during these Chapter 11 Cases, and the Debtors intend to promptly initiate a sale process and auction under section 363 of the Bankruptcy Code for the sale of all or substantially all of the Debtors' assets.  Among other things, pursuant to the Stalking Horse APA, Kennedy Lewis will "credit bid" the entire amount of its pre-bankruptcy loans and DIP Facility (described below) and assume certain liabilities associated with assumed contracts and trade payables.

28.     The Stalking Horse APA sets the floor for what the Debtors and their advisors hope will be a competitive sale process that maximizes value for all stakeholders.  To facilitate the sale process, Kennedy Lewis has agreed to provide crucial debtor-in-possession financing (the "DIP Facility").  The DIP Facility provides for a $40 million new money super priority senior secured term loan facility, which permits the use of the Debtors' cash collateral pursuant to an approved budget.  While Kennedy Lewis has agreed to support the Company during this challenging time, the support is conditioned on the prompt execution of a sale process that will minimize the

administrative expense of the Chapter 11 Cases while also ensuring that the Company's business is appropriately recapitalized and able to continue as a going concern for the benefit of all stakeholders.

The DIP Facility establishes certain key sale milestones as follows:

| Event | Timing |
| --- | --- |
| Entry of Interim DIP Order | Petition Date + 3 days |
| File Bidding Procedures Motion | Petition Date + 7 business days |
| Entry of Bidding Procedures Order | Petition Date + 30 days |
| Entry of Final DIP Order | Petition Date + 30 days |
| Entry of Sale Order | Petition Date + 100 days |
| Consummation of Sale | Petition Date + 120 days |

29.     Upon executing the Stalking Horse APA, the Debtors promptly commenced these Chapter 11 Cases.

## V.     Organizational and Capital Structure

### A.     Debtors' Corporate Structure

30.     There are two Debtors in these Chapter 11 Cases:  Stimwave (defined above), the manufacturer of the Company's products, and Stimwave LLC, which is the operating subsidiary in the United States.   As reflected in the corporate organizational chart attached hereto as **Exhibit A**, Stimwave is the direct parent of Stimwave LLC and the direct or indirect parent of several non-debtor subsidiaries.

### B.     Funded Debt

31.     The Debtors are borrowers under that certain Loan and Security Agreement dated May 13, 2019 (as amended, modified, or supplemented, the "Term Loan Agreement"), pursuant to which KLCPMF is lender and KLIM is collateral agent.

32.    The chart below sets forth the Debtors' funded debt obligations as of the Petition Date:

| Debt Obligation | Approximate Outstanding as of Petition Date |
|---|---|
| Term A Loans | $14,985,430.58 |
| Term B Loans | $7,082,871.19 |
| Term C Loans | $17,234,934.78 |

33.    At its inception on May 13, 2019, the Term Loan Agreement originally provided secured debt financing to the Debtors of up to $20 million in two tranches:  the "Term A Loan" amount of $10 million, which was funded on execution, and the "Term B Loan" amount of $10 million, which was not initially funded.

34.    The collateral securing the obligations under the Term Loan Agreement consists of all of the Debtors' rights, title, and interests in and to all of their personal property, wherever located.

35.    In connection with the original loan under the Term Loan Agreement, the Debtors issued to Kennedy Lewis a warrant to purchase 106,002 shares of Stimwave's Common Stock.

36.    The existence of the DOJ investigation (described further below) constituted a potential Event of Default under the Term Loan Agreement, and the facts alleged in the DOJ investigation, if true, would have resulted in further potential Events of default under the Term Loan Agreement.

37.    In addition, since March 2020, certain other potential Events of Default occurred under the Term Loan Agreement related to, among other things, the Debtors' failure to raise minimum cash proceeds from the sale of the Company's Series E Preferred Stock prior to September 30, 2020, failure to comply with certain minimum liquidity requirements, and failure to comply with certain minimum revenue requirements.

38.     Notwithstanding the dislocation and disruption resulting from the DOJ investigation and potential Events of Default under the Term Loan Agreement, and recognizing the inherent value of the Debtors' business and substantial progress made by the Company, Kennedy Lewis has continued to support the Debtors by forbearing from exercising its legal remedies and entering into various forbearance agreements and amendments to the Term Loan Agreement. In addition, Kennedy Lewis continued to advance funds to the Debtors.

39.     Between December 2019 and Petition Date, through a series of three forbearance agreements and six amendments to the Term Loan Agreement, Kennedy Lewis agreed to forbear from exercising remedies with respect to certain defaults and provided approximately $20 million in Term B and Term C Loans under the Term Loan Agreement. In connection therewith, (i) in March 2020, the Debtors secured the requisite stockholder approval and amended the Company's Certificate of Incorporation to create the Series E Preferred Stock, among other amendments; (ii) all of the Term B and Term C Loans under the Term Loan Agreement became convertible into Stimwave's Series E Preferred Stock; (iii) Kennedy Lewis was designated as the "Series E Lead Investor" under the Company's Certificate of Incorporation, entitling Kennedy Lewis to the benefit of certain protective provision and approval rights; and (iv) Kennedy Lewis was issued 500,000 warrants to purchase Stimwave's Series E Preferred Stock at an exercise price of $0.01 per share.

### C.     Unsecured Trade Debt

40.     As of the Petition Date, the Debtors estimate that their liquidated unsecured trade debt approximates $2.5 million. The Debtors also have accrued obligations ot employees, consultants, and sales agents, which is more fully described below.

### D.     Capitalization and Corporate Governance

41.     Notwithstanding the significant and inherent value in the Debtors' business and technology, their complex capital structure and Certificate of Incorporation and other governance

documents significantly impeded their ability to raise financing prior to the Petition Date.  The chart below sets forth the Debtors' capitalization as of the Petition Date:

|  | Authorized Shares | Outstanding Shares |
| --- | --- | --- |
| Common Stock | 14,993,481 | 3,159,973 |
| Series A Preferred Stock | 1,499,999 | 1,499,999 |
| Series A-2 Preferred Stock | 1,015,699 | 1,015,699 |
| Series B Preferred Stock | 722,075 | 722,075 |
| Series B-2 Preferred Stock | 944,559 | 944,559 |
| Series D Preferred Stock[3] | 3,273,858 | 2,526,238 |
| Series E Preferred Stock | 3,500,000 | 259,866 |

42.    The holders of the Common Stock are entitled to one vote for each share of Common Stock held.  Each holder of Preferred Stock is entitled to a number of votes equal to the number of shares of Common Stock into which the shares of Preferred Stock held by such holder could be converted as of the record date.

43.    Except as otherwise expressly required by law or the Company's Certificate of Incorporation, the holders of Preferred Stock and the holders of Common Stock vote together and not as separate classes, and holders of Preferred Stock are entitled to vote on all matters on which the Common Stock is entitled to vote.

44.    The size of the Company's Board of Directors is currently set at nine directors, although only six directors are currently in office.  The holders of Series A, A-2, B, and B-2 Preferred Stock, voting together as a single class, are entitled to elect one director.  The holders of Series D Preferred Stock are entitled to elect two directors.  KLIM, as the Series E Lead Investor, is entitled to elect two directors.  The holders of Common Stock are entitled to elect two directors.  And the remaining two directors are designated by the other members of the Board of Directors and are elected by holders of Common Stock and Preferred Stock voting together as a single class.

---

[3]    Certain Series D Preferred Stockholders have conditional rights to purchase and sell additional shares of Series D Preferred Stock that are not reflected in this table.

45.     Although the Debtors diligently sought out-of-court financing prior to the Petition Date, the Debtors were challenged by the fact that the following groups of stockholders must provide their written consent to any out-of-court financing: (1) holders of a majority of the outstanding shares of Preferred Stock, voting together as a single class; (2) holders of 68% of the outstanding shares of the Series D Preferred Stock, voting as a separate class; (3) holders of a majority of the outstanding shares of the Series E Preferred Stock, voting as a separate class; and (4) KLIM, as the Series E Lead Investor (together, the "Requisite Financing Consent").

E.     **The Establishment of the Executive Subcommittee**

46.     Following the departure of the Company's former Chief Executive Officer, the Board of Directors of Stimwave formed an Executive Committee and delegated to it the full power and authority of the Board of Directors to the fullest extent permitted by law.

47.     As a condition to agreeing to temporarily forbear from exercising its rights and remedies with respect to alleged Events of Default in connection with the July 29, 2021 forbearance agreement and amendment to the Term Loan Agreement, Kennedy Lewis required the Executive Committee of the Board of Directors to establish, and thereafter continuously maintain, a subcommittee (the "Executive Subcommittee"), the members of which are Paul LaViolette (as chair), Regina Groves, and Marc Loev.  Therefore, the Executive Committee delegated to the Executive Subcommittee all power and authority of the Executive Committee.

VI.     **Events Leading to the Chapter 11 Cases**

A.     **The DOJ Investigation and Subsequent Litigation**

48.     On October 7, 2019, the Debtors received a civil investigative demand from the DOJ pursuant to the False Claims Act.  On November 14, 2019, after examining the basis for the DOJ investigation and considering its options, the Board of Directors placed Ms. Perryman on leave and scheduled a meeting when they intended to inform Ms. Perryman that she was being

terminated as CEO.  Ms. Perryman resigned as CEO on November 24, 2019 prior to the meeting. From that time to the present, Debtors have fully cooperated with the DOJ investigation and have engaged in an exhaustive remediation of the Debtors' compliance and regulatory functions.

49.     On December 16, 2019, the Debtors filed a verified complaint against Ms. Perryman in Delaware Chancery Court, alleging that Ms. Perryman had breached her fiduciary duties to the Debtors, including, among other things, that she had "directed accounting staff to make changes to the accounting system and remove invoice references on checks with Wite-Out (sic) and photocopying so that invoices selected by the auditors for their revenue sample would appear to have been paid when, in fact, those invoices had not been paid." *See Stimwave Techs. Inc. v. Perryman*, Del. Ch. C.A. No. 2019-1003-SG, Dkt. No. 1, Verified Complaint ¶ 5.  That complaint was amended in February 2020 to include claims that Ms. Perryman had used Company assets to pay for her son's apartment, to further her personal interests, and to pay bonuses to her close friends.  *Id.*, Dkt. No. 88, Amended Complaint.  The trial in that action was stayed when another entity that was being operated by Ms. Perryman, which was also a defendant in the Delaware litigation, Micron Devices LLC, filed bankruptcy.  Following the completion of the Micron bankruptcy proceeding, the Company filed a motion to stay the action based on Ms. Perryman's invocation of the Fifth Amendment and unequivocal assertion that she will refuse to provide substantive answers to any deposition questions until the criminal investigation of her by the DOJ is concluded.  The Delaware Chancery Court granted the Company's motion to stay the action on May 4, 2022.

50.     On February 11, 2020, Ms. Perryman and her husband, Gary Perryman, who remains a member of the Debtors' Board of Directors, filed a verified complaint with the Delaware Chancery Court seeking advancement and indemnification in connection with the DOJ

investigation.   *See Perryman v. Stimwave Techs. Inc.*, Del. Ch. C.A. No. 2020-0079-SG, Dkt. No. 1.   While the court validated Gary Perryman's indemnification agreement, it rejected claims arisng out of  Ms. Perryman's indemnification agreement

### B.   Recent Financial Performance

51.     Since the resignation of Ms. Perryman in November 2019, financial performance has shown an improving trajectory.[4]   Revenue has grown from $43 million in FY2020, to $47 million in FY2021, up 9% year over year.   Unfortunately, the Company's liquidity position has remained strained as a result of the difficulties the Company faced in raising new capital due to stockholder voting rights agreements, ongoing operating losses, the impact of the DOJ investigation, substantial legal expenses from litigation, and the COVID-19 pandemic.   As described above, the Company has addressed liquidity shortfalls through a combination of stop-gap measures and additional term loan advances from Kennedy Lewis.   Going forward following the consummation of the sale, revenue growth is anticipated to accelerate, driven by a combination of: (i) increased re-investment in the Company; (ii) spending on product commercialization efforts; (iii) funding of clinical trials and associated market education activity; (iv) industry tailwinds (*e.g.*, growth in chronic pain patient population); (v) Healthcare Economic initiatives; and (vi) resolution of the various non-operational challenges detailed herein.

### C.   Retaining Advisors and Negotiations with Key Constituencies

52.     The overhang of the DOJ investigation, the aftermath of former management's actions, substantial litigation expenses, the headwinds brought about by the COVID-19 pandemic, among other things, resulted in a liquidity crisis for the Debtors.   As detailed above, these liquidity concerns were compounded by the fact that the Debtors' constituent corporate documents

---

[4]     Due to misrepresentations of prior management, the Company cannot stand behind financials prior to 2020. I reference 2019 performance only for purposes of illustration.

precluded them from raising any additional debt financing without the Requisite Financing Consent described above.

53.     In November 2020, the Debtors began working with their corporate counsel, Honigman LLP, on a transaction with Kennedy Lewis for additional financing.  In June 2021, the Debtors engaged Gibson, Dunn & Crutcher LLP as restructuring counsel and, in March 2022, the Debtors also retained Young Conaway Stargatt & Taylor, LLP as Delaware co-counsel.

54.     To further assist with their restructuring efforts, in April 2022, the Debtors retained Riveron RTS, LLC ("Riveron"), as their financial advisor, and GLC Advisors & Co., LLC ("GLC"), as their investment banker.

55.     After thorough deliberation and analysis and extensive negotiations with Kennedy Lewis, led by the Debtors' management and the Executive Subcommittee, the Executive Subcommittee concluded that commencing these Chapter 11 Cases would be in the best interests of the Debtors and their various stakeholders, and would allow the Debtors to maximize value for their cutting-edge technology and enable a truly fresh start.

### D.     The Stalking Horse APA

56.     As described in further detail above, negotiations with Kennedy Lewis progressed in the months before the Petition Date, with the parties engaging in intensive arm's-length negotiations surrounding the terms of potential out-of-court and in-court restructuring alternatives that would include additional financing from Kennedy Lewis.  Ultimately, the Debtors entered into the Stalking Horse APA with Kennedy Lewis.  As discussed above, pursuant to the Stalking Horse APA, Kennedy Lewis will credit bid the full amount of the obligations owed under the DIP Facility and the Term Loan Agreement and assume certain specified liabilities.

57.     In addition, the Debtors will immediately initiate a comprehensive, Court-supervised marketing and sale process in accordance with Court-approved bidding

procedures and subject to certain agreed-upon milestones set forth above.  At the conclusion of the sale and marketing process, the Debtors intend to sell all or substantially all of their assets to the purchaser that has submitted the highest or otherwise best offer for the subject assets.  GLC will begin actively marketing the Debtors' assets, and the Debtors anticipate third-party interest in the Company given its advanced technology and revenue prospects.

58.     I believe that the sale process contemplated by the Stalking Horse APA and bidding procedures will ensure that there is adequate opportunity to determine if a higher or otherwise better alternative to the sale contemplated under the Stalking Horse APA is available.  The Debtors and GLC will actively engage potential bidders post-petition to ensure that the sale process is as broad and competitive as possible.  The Debtors anticipate filing a motion to approve the bidding procedures with the Court promptly following the Petition Date, and, together with the Debtors' advisors, will conduct a value-maximizing marketing and solicitation process in accordance with the bidding procedures.

### E.    The Proposed DIP Facility

59.     Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "<u>DIP Motion</u>") filed contemporaneously herewith, the Debtors request authority to, among other things, enter into a superpriority, senior secured multi-draw term loan debtor-in-possession financing in a principal amount of $40 million, of which $12 million in principal will be made available on an interim basis.  In addition to the financing contemplated in the DIP Facility and in exchange for the authorization to use collateral and cash collateral (the "<u>Cash Collateral</u>"), the Debtors are granting adequate protection to

Kennedy Lewis, in the form of replacement liens, superpriority claims, reporting obligations, and payment of advisor fees.  The DIP Facility provides the Debtors with the necessary cash to meet immediate operational needs, and it provides the liquidity for a smooth transition into the Chapter 11 Cases.

**i.    The Debtors' Need to Borrow under the DIP Facility
and Use Cash Collateral During the Interim Period**

60.    As of the Petition Date, the Debtors will only have less than approximately $27,000.00 cash on hand, all of which constitutes the cash collateral of Kennedy Lewis and which is insufficient to run the Debtors' operations and administer these Chapter 11 Cases.  I do not believe it would be prudent, or even possible, to administer the Chapter 11 Cases solely on a "cash collateral" basis.

61.    Before the Petition Date, the Debtors, in consultation with their advisors, reviewed and analyzed their projected cash needs and prepared the Approved DIP Budget.  As part of this evaluation of the Debtors' liquidity position, the Debtors reviewed and analyzed the Debtors' 13-week and long-term cash flow forecasts.  These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including, but not limited to, the effect of the Chapter 11 Cases on the Company's operations, fees and interest expenses associated with post-petition financing, professional fees, and customer and vendor obligations, as well as the operational performance of the underlying business.

62.    I believe that the DIP Facility will provide the Debtors with the liquidity necessary to, among other things, make payroll and satisfy their other working capital and general corporate purposes, including funding essential payments to vendors and service providers.  Absent authority to enter into and access the DIP Facility, even for a limited period of time, I believe the Debtors will be unable to continue operating their businesses, resulting in a deterioration of value and

immediate and irreparable harm to the Debtors' estates.  Further, the Debtors require sufficient funding to administer their Chapter 11 Cases.  Accordingly, I believe that immediate access to the DIP Facility is essential so that the Debtors can assure their employees, customers, and vendors that the Debtors have sufficient capital to continue operating "business as usual" during the pendency of the Chapter 11 Cases and while they pursue a section 363 sale process.  I believe that the Approved DIP Budget provides an accurate reflection of the Debtors' anticipated funding requirements over the identified period and is reasonable and appropriate under the circumstances. I understand the DIP Facility also ensures that the Debtors have immediate access to their Cash Collateral.  I believe that the Debtors have an immediate need to access Cash Collateral to pay operating expenses, including essential vendors, in order to ensure a continued supply of goods and services essential to the Debtors' businesses.

63.     Accordingly, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

## VII.     The First Day Motions

64.     Contemporaneously herewith, in addition to the Motion to approve the DIP Facility on an interim basis, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and establish the schedule for confirmation of the Plan. The First Day Motions include the following:

- *Debtors' Motion for Order Authorizing the Joint Administration of Related Chapter 11 Cases*

- *Debtors' Application for Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent*

- *Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility Companies From Discontinuing, Altering, or Refusing Service, (II) Deeming Utility Companies to Have Adequate Assurance of Future*

*Payment, (III) Establishing Procedures for Resolving Requests for Additional Assurance, and (IV) Granting Related Relief*

- *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Continue Prepetition Insurance Policies and Pay All Prepetition Obligations in Respect Thereof and (II) Authorizing Banks to Honor Related Checks and Transfers*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Taxes and Fees; and (II) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay and Honor Certain (A) Prepetition Wages, Benefits, Commissions, and Other Compensation Obligations; (B) Prepetition Employee Business Expenses; and (C) Workers' Compensation Obligations; (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations; and (III) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued (A) Use of Cash Management System; (B) Use of Prepetition Bank Accounts and Certain Payment Methods; and (C) Performance of Intercompany Transactions in the Ordinary Course of Business and Granting Administrative Expense Status for Postpetition Intercompany Claims; and (II) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders Authorizing Maintenance, Administration, and Continuation of Debtors' Customer Programs and Practices*

- *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and Lien Claimants; (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief*

65.     The First Day Motions seek authority to, among other things, obtain financing, honor workforce-related compensation and benefits obligations, pay claims of vendors and suppliers, satisfy any outstanding tax obligations, maintain suitable and appropriate insurance coverage, and continue the Debtors' cash management system and other operations in the ordinary course in order to ensure minimal disruption of the Debtors' business operations during the pendency of these Chapter 11 Cases.

66.     I am familiar with the substance contained in each First Day Motion, and I believe that the relief sought in each First Day Motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity or value, (b) constitutes a critical element in the Debtors achieving a successful and prompt reorganization and (c) best serves the Debtors' estates and their stakeholders' interests.  I have reviewed each of the First Day Motions, and the facts and descriptions of the relief set forth therein are true and correct to the best of my information and belief and are incorporated herein in their entirety by reference.  If asked to testify as to the facts supporting each of the First Day Motions, I would testify as to such facts.

A.     **Motion for Joint Administration**

67.     Many of the motions, applications, hearings, and orders in the Chapter 11 Cases will jointly affect both Debtors, who I understand are "affiliates" within the meaning of the Bankruptcy Code.  Under these circumstances, the interests of the Debtors, their estates, their creditors, and other parties in interest would be best served by the joint administration of the Chapter 11 Cases for procedural purposes only.  Joint administration of the Chapter 11 Cases will ease the administrative burden on the Court and all parties in interest.

68.     For these reasons, the Debtors submit, and I believe, that the relief requested in the motion is in the best interest of the Debtors, their estates, and their creditors and therefore should be approved.

B.     **Application to Appoint 156(c) Claims Agent**

69.     The Debtors request entry of an order authorizing the retention and appointment of Kroll Restructuring Administration LLC ("Kroll") as their claims and noticing agent in the Chapter 11 Cases.  The Debtors selected Kroll after soliciting proposals from Kroll and three other potential claims and noticing agents.  I believe that the relief requested in Kroll's retention application will ease the administrative burden on the Clerk of the Court in connection with the Chapter 11 Cases.

In addition, I have been advised by counsel that Kroll's retention is required by the Local Rules in light of the aggregate number of the Debtors' creditors.  Accordingly, the Debtors believe that the application should be approved on the terms proposed.

### C.      Motion to Provide Utility Companies with Adequate Assurance

70.      The Debtors require various utility services at their corporate headquarters, and such services are provided by several utility companies (collectively, the "Utility Companies"). Because the Utility Companies provide essential services to the Debtors, any significant interruption in utility services would be highly problematic.  In fact, the temporary or permanent discontinuation of utility services could irreparably disrupt business operations and diminish sales revenue, and, as a result, fundamentally undermine the Debtors' efforts to maximize value.  I understand that under section 366 of the Bankruptcy Code, the Debtors' Utility Companies are entitled to a form of "adequate assurance" of future performance.  Accordingly, the Debtors have proposed to protect the rights of the Utility Companies by providing such Utility Companies with a deposit in an amount equal to approximately 50% of the Debtors' estimated monthly cost of utility services subsequent to the Petition Date.  The Debtors submit that the deposit, together with the Debtors' ability to pay for future utility services in the ordinary course of business, constitute adequate assurance of future payment to the Utility Companies to satisfy the requirements of section 366 of the Bankruptcy Code.  To the extent that the Utility Companies disagree, however, the Utility Companies would be able to utilize the Debtors' proposed procedures to seek additional adequate assurance.

71.      I believe the Debtors' proposed treatment of the Utility Companies is appropriate under the circumstances, and I am advised by counsel that the proposed procedures are consistent with procedures routinely approved in this District.  Accordingly, I believe that the relief requested is in the best interests of the Debtors, their estates, and creditors and therefore should be approved.

**D.      Motion to Honor and Continue Insurance Programs**

72.      In the ordinary course of their business, the Debtors maintain numerous insurance policies that provide coverage for, among other things, (i) property; (ii) commercial general liability; (iii) umbrella liability; (iv) products liability; (v) directors & officers; (vi) excess directors & officers; (vii) cyber liability; and (viii) international locally-admitted (collectively, the "Insurance Policies").  A listing of all known policies currently in effect, which list I have reviewed, is attached as an exhibit to the Debtors' motion.  In addition, the Debtors are seeking as part of the Insurance Policies a tail policy for the D&O insurance coverage; while they have not yet procured that policy, the Debtors seek approval to pay that premium when they obtain that policy.

73.      In connection with the Insurance Policies, the Debtors obtain brokerage services from Marsh & McLennan Agency LLC (the "Broker").  The Broker assists the Debtors in obtaining comprehensive insurance for the Debtors' operations by, among other things, assisting the Debtors with the procurement and negotiation of the Insurance Policies and enabling the Debtors to obtain those policies on advantageous terms at competitive rates.

74.      The Debtors' Insurance Policies are essential to preserve the value of the Debtors' business and assets, and are, in some cases, required by various laws, regulations or contracts that govern the Debtors' business (and I am advised that certain insurance policies are also required by the Guidelines established by the Office of the United States Trustee for chapter 11 bankruptcy cases).  In addition, the directors and officers of the Debtors require continued D&O insurance during the pendency of these Cases and for a customary tail period after the consummation of the Asset Sale.  It is critical that the Insurance Policies be maintained and renewed on an ongoing and uninterrupted basis.  Therefore, the Debtors request that the Court authorize them to pay all prepetition premiums, fees, and expenses arising under, or related to, the Insurance Policies, if any,

including with respect to any Broker's fees.  For these reasons, I believe that the relief requested is in the best interests of the Debtors, their estates, and creditors and therefore should be approved.

### E.     Motion to Honor Prepetition Taxes

75.     In the ordinary course of their business, the Debtors incur and/or collect certain prepetition taxes, including, but not limited to, income, franchise, business and occupation, commercial activity, and miscellaneous state taxes, and various other taxes, fees, charges, and assessments, as applicable (collectively, the "Taxes and Fees"), and remit such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (collectively, the "Taxing Authorities"). The Taxes and Fees are paid monthly, quarterly, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid.

76.     As of the Petition Date, the Debtors do not believe they owe any amounts with respect to accrued but unpaid Taxes and Fees.[5]  However, out of an abundance of caution, in the event that any pre-petition Taxes and Fees are identified, the Debtors are seeking authority to pay all prepetition Taxes and Fees in the ordinary course of business.  For the avoidance of doubt, the Debtors are not seeking authority to pay any amounts on account of past-due taxes or to prepay any taxes that do not constitute trust fund taxes and non-estate property.

77.     The Debtors have ample business justification to pay the Taxes and Fees because it is my understanding that: (i) certain of the Taxes and Fees do not constitute property of the

---

[5]     The Debtors are exempt from collecting and remitting sales taxes in the states in which they operate because they sell medical devices.  Certain states require the Debtors to file an informational tax return for sales taxes.  The Debtors have an accrued tax liability on their balance sheet with respect to certain potential fines and penalties for unfiled sales tax returns in states where it would be cumbersome and tedious for the Debtors to file such informational returns for *de minimis* sales.  In their business judgment, the Debtors determined that accruing these amounts for un-asserted non-filing penalties and fees on their balance sheet greatly outweighs the time and expense of continuously filing the associated returns and other related filings.  The Debtors are not seeking to pay any such accrued and unpaid fines and penalties through this Motion.

Debtors' chapter 11 estates; (ii) substantially all of the Taxes and Fees constitute priority claims; (iii) the failure to pay certain of the Taxes and Fees may impact the Debtors' ability to conduct business in certain jurisdictions and their ability to perform under their postpetition agreements; and (iv) the Debtors' directors and officers may face personal liability if certain of the Taxes and Fees are not paid.  Absent payment of these amounts, the Debtors may face serious disruptions and distractions during the administration of the Chapter 11 Cases, as well as hinder the Debtors' efforts to maximize estate value through these restructuring proceedings.  I believe that the motion should be approved because it is in the best interests of the Debtors, their estates, and creditors.

### F.      Motion to Honor and Continue Employee Obligations and Benefits

78.      The continued and uninterrupted support of the Debtors' workforce is essential to the Debtors' success.  The skills and experience of the Debtors' employees (including their independent contractors and sales agents), their relationships with key parties to the Debtors' business, such as customers and vendors, and their knowledge of the Debtors' businesses are essential to the preservation and maximization of the value of the Debtors' estates.  Interruptions in payment of prepetition workforce-related obligations will impose hardship on the workforce and is certain to jeopardize their continued performance during this critical time.

79.      To minimize the personal hardship that the workforce will suffer if prepetition workforce-related obligations are not paid when due, and to maintain the workforce's morale during this critical time, it is important that the Debtors be permitted to pay and/or perform, as applicable, their workforce-related obligations, as detailed in the Debtors' motion, including with respect to the following, whether arising pre- or post-petition:  (i) workforce wages, salaries, commissions, paid time off, and other compensation; (ii) employee business expenses; (iii) contributions to prepetition benefit programs provided to employees; (iv) workers' compensation obligations; (v)  payments for which prepetition payroll deductions were made;

(vi) processing costs and administrative expenses relating to the foregoing payments and contributions; and (vii) payments to third parties incident to the foregoing payments and contributions.  A chart setting forth the proposed maximum prepetition amounts the Debtors seek to pay with respect to each category of employee wages and benefits is set forth below:

| Workforce Obligations | Approximate Amount Outstanding |
|---|---|
| Unpaid Wage Obligations | $900,000.00 |
| Independent Sales Agent Obligations | $300,000.00 |
| Independent Contractor Obligations | $70,000.00 |
| Employee Expenses (Including Corporate Card Expenses) | $510,000.00 |
| Healthcare Programs | $120,000.00 |
| PTO and Leave Policies | $325,000.00 |
| **Total:** | $ 2,225,000.00 |

80.    Through the motion, the Debtors seek authority to pay $2.175 million on account of prepetition workforce compensation and benefits on an interim basis and $2.225 million on account of prepetition workforce compensation and benefits on a final basis.

81.    The relief requested in the Debtors' motion is essential to the continued operation of the Debtors' businesses and will enable the Debtors to operate during the Chapter 11 Cases without disruption, thereby maximizing value for the Debtors' estates, creditors and other stakeholders.  Moreover, I am advised by counsel that the Debtors do not seek to compensate any employees on behalf of pre-petition obligations in an amount that exceeds the statutory priority cap of $15,150.00, unless required by applicable state law or as described below, and the Debtors will not make any payments to insiders that would violate the Bankruptcy Code.  As discussed more fully below, the Debtors seek to pay certain essential independent sales agents (the "Independent Sales Agents") in excess of the statutory cap through the final order approving this

motion.  For these reasons, I believe that the motion is in the best interests of the Debtors, their estates, and creditors, and, therefore, should be approved.

82.     Like other medical device companies, the Debtors utilize a mix of employee sales representatives and Independent Sales Agents, all of which are critical to the success of the Debtors' business.  The Independent Sales Agents provide various services to the Debtors including, among other things, (i) marketing and selling the Debtors' products to prospective customers, (ii) providing technical expertise in connection with the surgical implant of the Debtors' products, (iii) managing the Debtors' inventory, (iv) educating customers on the Debtors' therapy services, and (v) negotiating contracts with customers.  As of the Petition Date, the Debtors retain approximately sixteen Independent Sales Agents, each of whom is assigned unique, specific territories throughout the United States for sales and for patient services.  Their continued services to the Debtors are critical to the Debtors' ability to maintain and generate revenue and to provide ongoing, lifelong support to patients who have received the Debtors' implanted therapy products.   Without that continued service, the Debtors will likely not be able to continue as a going concern.  In the aggregate, the Debtors owe these Independent Sales Agents approximately $300,000.00 in pre-petition commissions (the "Commissions"), and 5 of them are owed more than the statutory cap of statutory priority cap of $15,150.00.  Importantly, out of these Commissions, the Independent Sales Agents pay for their salaries, employee salaries, sub-agents, benefits and all related business expenses in connection with sale of the Company products (which the Company would pay directly if they were Company employees).  If the Debtors fail to make these payments in full, I believe it will be impossible for the Debtors to retain the Independent Contractors' services, and even the loss of one of these Independent Contractors will result in millions of dollars of lost revenue.  Therefore, the Debtors seek authority to continue paying the Independent Sales

Agents in the ordinary course of business, up to a cap of $250,000.00 on an interim basis and a cap of $300,000.00 on a final basis.

### G.   Motion to Continue Using Existing Cash Management System

83.   In the ordinary course of business, the Debtors operate a cash management system (the "Cash Management System") involving four bank accounts (collectively, the "Bank Accounts").  The Cash Management System provides a well-established mechanism for the collection, management, and disbursement of funds used in the Debtors' business.

84.   In light of the size and complexity of the Debtors' operations, significant disruptions to the Debtors' business would be highly likely if the cash management procedures must be quickly altered.  As such, it is essential that the Debtors be permitted to maintain their Cash Management System in its current format.  The Debtors, therefore, seek authority for the continued use of the Cash Management System and Bank Accounts.  The Debtors further seek authority to implement ordinary course changes to their Cash Management System and to open and close bank accounts.  The Debtors also request authority for the banks to charge and the Debtors to pay or honor service and other fees, costs, charges and expenses to which the banks may be entitled under the terms of and in accordance with their contractual arrangements with the Debtors.

85.   In the ordinary course of their business, the Debtors maintain business relationships between and among themselves and their non-debtor affiliates (the "Non-Debtor Affiliates").  As part of these business relationships, the Debtors and Non-Debtor Affiliates participate in a variety of intercompany transactions (the "Intercompany Transactions") that generate intercompany receivables and payables (the "Intercompany Claims").  The Debtors maintain strict records of the Intercompany Claims and can ascertain, trace, and account for all Intercompany Transactions.  The

Debtors will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

86.     The Intercompany Claims primarily arise from the Debtors' provision of inventory to their Non-Debtor Affiliates, including underlying services related to the inventory.  The Debtors direct the manufacturing of certain inventory used to produce their neurostimulation products, perform quality control and regulatory compliance services, and then transfer the inventory to their Non-Debtors Affiliates.  The Debtors maintain strict records of the inventory provided to their Non-Debtor Affiliates and accrue for it each month.  The Non-Debtor Affiliates periodically transfer excess cash to the Debtors to pay and/or reimburse them for the inventory, subject to intercompany liquidity needs.  On average, the Debtors accrue charges against the Non-Debtor Affiliates totaling approximately $150,000.00 per month for goods and services, and the Non-Debtors Affiliates transfer approximately $150,000.00 in cash per month to the Debtors.[6] The intercompany receivables and payables are reconciled at year-end to ensure a fair and reasonable transfer price on the sale of the inventory to the Non-Debtor Affiliates.

87.     The Cash Management System provides the mechanism for cash to flow through the Debtors and Non-Debtor Affiliates so that operations may be maintained.  To lessen the disruption caused by the Chapter 11 Cases and to maximize the value of the Debtors' estates, I believe that it is essential that the Debtors be allowed to continue to use Intercompany Transactions in the ordinary course.

---

[6]     The monthly accrual is estimated based on the cost of the goods and services provided by the Debtors to the Non-Debtor Affiliates plus a pricing profit estimate for the transfer.

### H. Motion to Honor Customer Programs

88.     In the ordinary course of their business, the Debtors engage in various customer practices (the "Customer Programs and Practices") to (i) ensure compliance with federal and state laws, (ii) develop, support, and sustain a positive relationship with their customers, physician users and patients, and (iii) remain competitive with other similar companies, including a discount and rebate program, a warranty/replacement products program, and ongoing patient care and support services.   The Customer Programs and Practices are standard in the Debtors' industry, and generally comprise certain practices that are implemented to ensure compliance with applicable law and ensure that patients who are being treated with the implanted device continue to receive therapeutic benefits from the device.

89.     The Debtors' industry is competitive, and the success of the Debtors' business hinges on the Debtors' relationship with their customers.  It is therefore essential that they maintain a strong connection with their current customers.  Ultimately, the Debtors believe that it is in the best interest of the estates to continue to honor the Customer Programs and Practices in order to maintain the productive relationships the Debtors have with their customers, without the benefit of which the Debtors' business, and ultimately the outcome of the Chapter 11 Cases, would be irreparably harmed.  In furtherance thereof, I believe that the continuation of the Customer Programs and Practices is a critical component of maximizing estate value and that the relief requested in the motion should therefore be approved.

### I. Motion to Honor Claims of Critical Vendors and Lien Claimants

90.     As further detailed above, the Debtors are a rapidly growing medical device manufacturer and provider with cutting-edge technology that offers neurostimulation products for opioid-free treatment of chronic pain.  The Company's battery-free devices offer its patients neurostimulation implants that are less invasive and with fewer potential complications than its

competitors.   It is an innovator in the established spinal cord stimulation market and a market-defining leader in the high-growth peripheral nerve stimulation space.

91.    In the ordinary course of business, the Debtors engage a limited number of providers (collectively, the "Critical Vendors") for certain goods and services that are essential to the Debtors' business.   The majority of Critical Vendors comprise inventory suppliers whose products are necessary components of the Debtors' neurostimulation products.   Many of these suppliers offer specialized parts for which there are no substitutes.   The remaining Critical Vendors provide various goods and services that are essential to the success of the Debtors' business, including clinical trial assistance and services, specialized marketing services, and regulatory compliance support.   As of the Petition Date, approximately $1.165 million is owed to Critical Vendors, inclusive of claims arising under section 503(b)(9) of the Bankruptcy Code, which the Debtors estimate to be approximately $735,000.00.

92.    In the ordinary course of business, the Debtors also engage certain vendors (together with the Critical Vendors, the "Vendors") who provide shipping and transportation services and, under applicable non-bankruptcy law, may have the potential to assert liens against certain of the Debtors' assets if the Debtors fail to pay for services rendered prior to the Petition Date (such claims, the "Lien Claims"). These shippers holding Lien Claims provide essential logistical support for the Debtors' operations and facilitate the distribution of the Debtors' inventory.  The Debtors estimate that, as of the Petition Date, the aggregate amount of Lien Claims held by the shippers and transportation providers is approximately $37,500.00, far less than the value of the goods and equipment that the shippers may possess as of the Petition Date.

93.     The Debtors seek entry of an order authorizing the Debtors to pay, in their discretion, the claims held by the Vendors, subject to a cap of $1.2 million in the interim and final orders approving the motion.

94.     The Debtors believe it is absolutely critical that the Debtors' supply network operate on a seamless basis to preserve the going concern value of the Debtors' business and operations.  Without the instant relief, the Debtors' ability to maximize value and drive revenue would be severely undermined and, therefore, the Debtors request approval of the relief requested because it is in the best interests of the Debtors, their estates, and creditors

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 15, 2022
       Ponte Vedra, Florida

/s/ Aure Bruneau
Aure Bruneau
Chief Executive Officer
Stimwave Technologies Incorporated

**<u>EXHIBIT A</u>**

**Organizational Chart**

# Stimwave Technologies Incorporated
## Legal Entity Structure

